Good morning. Good morning, Your Honor. My name is Phil Kohler, and I represent the Department of Juvenile Corrections in this matter, and specifically in connection with this appeal. I'm sorry, I missed a couple of words that you said. Could you just say them again? Yeah. My name is Phil Kohler, and I'm representing, in this case, the Department of Juvenile Corrections, and in connection with this specific appeal. Not the individuals? As I was saying, the individuals, Sharon Harrigfeld and Betty Grimm, because as you are very much aware, this is an appeal dealing with the denial of a qualified immunity for those two individuals. According to the current Second Amendment complaint in this case, the plaintiffs contend that they experienced workplace retaliation from the individual defendants when they exercised their First Amendment rights to free speech in the workplace. Through discovery, each of these plaintiffs were questioned under oath about the nature of the speech that they allege was the basis of their retaliation claims, and specifically they were asked to describe any reports or complaints they made of government waste or criticisms of the facility management. Their responses were either that they did not make any such complaints or reports, or if they did. We've got the letters, letters to, I think, a state senator and the governor and a U.S. senator. That was an e-mail dealt with one plaintiff, Ms. Ledford, only Ms. Ledford. Okay, why weren't her First Amendment rights violated by some sort of retaliation for sending those e-mails? Why is there qualified immunity for whatever was done to her in response to those e-mails? With respect to Ms. Ledford, when she was asked, she described the conditions that caused her workplace stress, the retaliation, dealt with the circumstances leading to her FEMLA request for FEMLA leave and the granting of that. That happened. Her FEMLA leave was first requested and granted in late July of 2011. The e-mail that you referenced was authored five months later, in December of 2011. Oh, so she took the leave before the e-mails, so it couldn't have been punishment for the e-mails. Correct. It had absolutely nothing to do with what she described was the circumstances that caused her to request FEMLA leave, the stress, which was really arising out of disagreements, and she did not get along with two of her supervisors, well, one and then one that came on after that. Let's put the FEMLA issue to the side. She also alleges that there was a hostile work environment that was created. Why isn't that something that ought to go to the jury for a determination of whether or not, first of all, whether it existed, and secondly, whether there was retaliation? Well, I think what she was referring to when she was asked was the list of expectations that were, and that's referenced in the district court's opinion, that were created by her supervisors. And if you look at those list of expectations, what those are is really instructions by her supervisor about what they expect her to do to do her job. And the list is found in the excerpts of record at page 1267, and they involve pre-approval of overtime. She needs to call in when she's sick. She needs to pre-schedule vacation. She needs to take her breaks limited to the 15 minutes that's allowed by the written policy, and there's a time frame during the day that she's expected to have her reporting done. She's supposed to attend morning briefing sessions, and she's supposed to respond promptly to e-mails, and then she's to be courteous to her coworkers and her supervisors. Well, I understand that's your perspective on it, but there are several references in the record, ER 1283-84 and SER 2129, 3190-91, that suggest, at least from her perspective, even the parties generally agree, there was continued hostility, repeated conflicts between her and her supervisors, including Grim. And we have a case at Cold's Altar, which seems pretty close to the facts in this case. Now, the other stuff may have been within her normal work environment or responsibilities, and the FEMLA is out of the time framework, but why doesn't Cold's Altar suggest that at least with respect to this hostile work environment claim, that that ought to go to the jury? Well, because when she was asked to describe the hostile work environment, this is what she spoke to as the list of expectations. She did not, when she was asked to describe anything that either of these two defendants did that discouraged her, prevented her from speaking out on anything she wanted, she said they didn't, and I kept speaking out on anything I wanted. Let me just read something to you from the Cold's Altar case. This is what went to a jury there. The claim was an unwarranted disciplinary investigation, a reprimand containing a false allegation, and repeated and ongoing verbal harassment and humiliation. That's pretty close, isn't it? And in Cold's Altar, I agree. If you look at Cold's Altar, and I think those series of cases that control is Cold's Altar, Dahlia, and the Nunez case. And if you look at all those in conjunction with one another, in Dahlia the court concluded that threatening an employee with possible jail and criminal investigation clearly would have a chilling effect, clearly would. Cold's Altar was closer, but there was clear facts that were described and shown to the district court that there was a campaign of unwanted discipline, reprimands, and it was unwarranted and without. With respect, counsel, at least the way I read the record, this is all in the eye of the beholder. I respect the fact that from your perspective this was all pretty normal stuff, but it seemed to me that both sides seemed to agree there was some real hostility here. It was a very tense work environment between Ms. Ledford and her supervisors. You may actually be correct, but isn't this something that the jury or a jury or at least a finder of fact should determine? Only if this retaliation and hostile work environment, assuming that it goes past the Nunez case, and you are more familiar than that, obviously familiar with that case. If that raises to that level, then possibly. But it still has to be in response to and retaliation of protected speech that Ms. Ledford engaged in. And when she was repeatedly asked, what did you, what is the speech that you contend that you engaged in, and what were the defendant's responses, she repeatedly said, none. Other than a brief, a passing reference to the safety and security of inmates, and what that deals with is the room time policy. Because what happened is Ms. Herrick-Beltran learned that staff was confining juveniles to their rooms, an eight-foot by eight-foot room for excessive amounts of time that far exceeded national standards, and they made a policy that said this is going to stop confining them to the room for staff convenience, whether it be to attend meetings, you just can't get around to taking care of them, having pizza parties, whatever it might be. That stops. I understand that part of it. But the record seemed to suggest that she spoke about unfair hiring practices, time padding by employees. That wasn't within the scope of her professional responsibilities, was it? Well, yes, and to some extent, yes. The hiring practices dealt with one individual. Her name was Laura Roeders, and she was promoted and hired as a supervisor. That was the basis of the Gregson petition, and the people, these rehabilitation technicians did not like her, and the reason for it is she is the individual in her prior, in her job, is the person that discovered the room confinement statistics that led to the change in the policy, also led to the eventual firing of the prior supervisor because he chose not to follow the directive that confining kids for staff convenience is not going to be tolerated. He kept doing it, and he got fired for it. Let me see if I've got that right. The children were being confined well beyond national standards for how many hours they should be confined. Laura Roeders discovered it. Laura Roeders got promoted to do something about it, and the employees who are suing objected to Laura Roeders being promoted out of order. That is all correct with the exception of only the statement that Laura Roeders was hired to do something about it. The policy change was made by Ms. Herrickfeld and Ms. Grimm. Laura Roeders, as a supervisor, is then charged with the responsibility of implementing it. So the directors decided to do something about it and promoted Laura Roeders who reported it to them to implement their policy. She was hired to an open position, and when the former supervisor in this unit was fired, that position was open. She was transferred from the one supervisor position to that one over the O&A unit. When I look at these First Amendment cases, it looks to me like we're supposed to distinguish between speech on matters of public concern and speech not on matters of public concern. I would think that if the disgruntled employees here were speaking to the state senators and whatnot and saying they're letting the children run wild here, it's dangerous, that would be speech on a matter of public concern. If they're saying we're being made to work too many hours or we're not being given enough compensable hours or the wrong person is being hired or promoted into a spot, that would be an ordinary personnel matter, not a matter of public concern. Do I have that right so far? I think you're correct. The context of what is the protected citizen speech as opposed to the unprotected employee speech requires a practical approach, depending on what the nature of their job is and are they speaking out on matters that deal with their job as they normally do. An important part in this case is of all these plaintiffs, the only person who made any kind of a comment or a statement outside their chain of command was Ms. Ledford. Why aren't her letters to all these public officials on matters of public concern? There is only one email, and it went to the state senator, Mr. Hill, and you have it in your record at ER2017. And what that dealt with, when you look at it, is she mentions in passing a petition that she didn't sign because it was circulated when she was on her FEMLA leave, and this email goes out while she's on her FEMLA leave. And she talks about some passing criticisms she has of the management, but if you look at it in its full context, what she's complaining about is the denial of her request for intermittent FEMLA leave. It starts, I am requesting assistance with my recent FEMLA. Is she complaining about her own dispute with management about her FEMLA leave, or is she trying to report matters of public concern outside the chain of command? I'd submit to you what she is doing is trying to, much like the assistant district attorney in the Connick v. Myers case, is trying to turn her own complaint, workplace complaint, into cause celebrite A. Is the FEMLA complaint the only thing that Ms. Ledford referred to in the email? Not the sole thing, but if you are going to look at them, of every one mention of anything other than FEMLA, the rest of it, ten times of it, is all FEMLA. Basically, I think you just indicated in your colloquy with my colleague that the rule for determining whether these fall within normal employment channels or their public statements is an intense fact-based evaluation by the court. You just kind of go through it on an ad hoc basis and pick it out. If we have the email, for example, if that were the only communication, is it your position that what we have to do is to look at what the gravamen of the email was overall? Is it a relative weight? If she mentions public matters in a third of the email and non-public matters in two-thirds, does that disqualify it under the law? I think you have to look at the gravamen of the email, and from that, what is she trying to accomplish? It's hard to look. It's one paragraph that goes on for three pages, single space. It was a little hard to read. Could you just point to the critical parts? Excuse me, Your Honor? Could you just point to the critical parts? It's one single space paragraph that runs on for three pages with all kinds of stuff. The critical, well, I think you have to, like Judge, and I don't want to be, I'm not trying to be evasive, I think you have to look at the whole thing, like Judge said, in context and look at the overall content of it and then ask from its overall content, what is this employee trying to convey to the reader? Are they complaining about their personnel problem and gain support for that? And in order to gain support for that, throw in other allegations of, I think this place is mismanaged for reason A, B, or C. What are they trying to accomplish? And I think if you look at the email and read it in total and in context, the clear message of what Ms. Ledford is doing with this email is she is advancing her personal complaint about her request for FEMLA. And I think it's also important to point out. It cannot be a matter of public concern, right? And whether it is a matter of public concern or is it a matter of personnel grievance, is that really what this is? And one last thing I think is important because I know my time is up, Your Honor. Your time is gone. The only employee who ever saw this was Ms. Ledford. She is not speaking to other people. She is not speaking on behalf of other people. So this involves her only. Thank you. Thank you very much, counsel. Now I'll hear from the appellee. May it please the Court, I am Andrew Schappe. I represent all the plaintiffs in this matter and here on appeal. I'd point out first that we have ten plaintiffs in this case, nine more than just Ms. Ledford. They are rehabilitation technicians, nurse, other safety and security officers, maintenance people, all of whom have spoken. I couldn't see where any of them spoke out of the workplace, where any of them talked out of school on matters of public concern and got punished for it except possibly Ledford who did talk out of school. But I don't know if it was on a matter of public concern or she got punished for it. What about the nine others? Did they talk out of school and get punished for it? Yes. There were reports made to the Division of Human Resources. There was the all-staff meeting. There was a petition. Wait, all-staff meeting is not talking out of school. The basic idea ever since Pickering is if you talk out of school on a matter of public concern and you get punished for it, that is First Amendment violation. And that's the clearly established law. And you need those three things. Now, a staff meeting is not talking out of school. The petition was actually regarded as talking out of school by Herigfeld and Grimm. This was circulated amongst employees, and the contents were also discussed at that all-staff meeting. And these were employees who were talking about things that are not within the scope of their job duties but which concern things like the department failing to follow state guidelines on merit-based hiring, specifically with respect to Ms. Roeders, not just making the wrong choice for a position but, in fact, actually giving her a position without going through the proper channels. Let's assume you're right on that issue. Wherein were any of these folks except Ledford actually damaged? Where did they claim that they were damaged by what they said? The rehab technicians, all of whom reported their concerns to their supervisor, who then testified that he relayed those by name to Grimm and Herigfeld, were victims of disparate shift assignments, onerous shift assignments. Shane Penrod was one of the supporters of the petition, was given an onerous graveyard shift switch, whereas he, up to that point, had been accommodated due to his autistic son. Others were warned not to speak out again. This is in the record as a claim? Yes, it is, Your Honor, and it's all reflected in the response brief as well. And also feared for their own safety and that of the juveniles who were incarcerated there when the department would, for example, start reclassifying incidents so that certain kinds of even violent incidents that had occurred before would no longer have to be reported as such and thus recorded. In other words, the safety numbers were being inflated at the risk of the employees and the staff and the public because these kids are being moved through programs. In effect, though, so what you're saying is we get back to what Judge Feinfeld talked about. Were these matters that were revealed in school, if you will, within the scope of their employment? If that's the case, then they don't have any cause of action here. Is that correct? I would disagree with that, Your Honor. I think the Hagen case and I think it's also, forgive me, FRITAG stand for the proposition that simply because speech relates to the subject matter of their employment doesn't mean it's not protected. These are people like a maintenance man speaking out on policies that should be followed by the entire department. I don't know where you get that out of those cases. It's quite clear, is it not, that if you, within your work environment, complain about work conditions, that's in school, in quotes, and it's not First Amendment protected. I don't think we're talking about work conditions so much as corruption. The favoritism violates the merit-based hiring system. Charges of corruption are inherently a First Amendment concern. What incident of corruption are you talking about? Are you talking about the hiring of that one supervisor? Is that what you're talking about? No, there are other instances in the record of employees being… You're talking about the time cards. Time card falsification. But that's Ledford, right? That is Ledford in particular. Is there anybody besides Ledford? For the time card falsification? That made claims of what you're calling corruption. Yes. Joe McKinney reported that refused to continue to backdate court records concerning juveniles, progress reports, things like that. They were supposed to go to juvenile courts. The rehab techs and safety and security officers protested the reclassification of violent incidents to inflate the PBS numbers, making the department look better, even at the expense of the safety of everybody there and the public. There were issues concerning waste, the damage done by juveniles to the buildings going un-recompensed, even though those remedies are violated. Also, civil rights violations concerning the juveniles' conditions in the context of that safety. Inappropriate behavior between members of the staff, especially female members of the staff and male juveniles, going ignored by Ledford's own… Why isn't all that within the scope of their ordinary duties? Some people have some of those duties. None of these people set policy. None of these people are responsible to ensure that the department, at a department level, follows the laws of the state of Idaho. All of them were reporting, though, on these issues of safety, on these issues of how the department was actually violating federal law, CRIPA, PREA, civil rights of the minors, and these things were going ignored by the management. Let me switch over to Ledford. Let's assume that she made some statements to somebody other than her supervisor about matters of public concern. Now, to have a viable claim, there has to be some kind of retaliatory action by the supervisor or by the employer. Now, what is the retaliatory action that was taken against Ledford? In Ledford's case, the expectations list that Mr. Collier… Why is that a retaliation? It's the ordinary thing a supervisor gives to what the supervisor considers an underperforming employee. It's not cutting your pay. It's not making you work longer for no pay. It's not even putting a warning in your personnel file. I mean, they were just ordinary expectations, too, aren't they? No, they were not, actually. What's not ordinary about them? Name me one expectation that's not, say, a regular thing an employee should be doing. Sure. She was instructed to not speak. Not what? To not speak. No, not speak to certain people. Not speak to certain people. These are also particular to Ledford. According to a later supervisor, following the supervisor who imposed those, these were expectations. Now, why is that retaliatory action in terms of, you know, the conditions of employment? It makes it difficult for a safety and security officer to do her job. It made her fear continuing to speak out about the safety and security problems and issues. Is that the worst of the expectations? Is that the worst of them? No, the expectations list. I believe that was probably the worst on the expectations. Anything else, any other action taken against her? Ultimately, she was terminated for recording a conversation. So part of Ledford's claim is that she was terminated in retaliation for exercising her First Amendment rights? That occurred during dependency, actually, just prior to summary judgment. That was not part of the original complaint. I didn't understand her claim to say that. I'm sorry, what? I didn't understand her complaint to make that claim that she was terminated. It did not. It did not. I didn't think so. Are you saying that's part of her claim, though, that she was terminated for exercising her First Amendment claims? That would certainly be a retaliatory action. Not at this point. The issues on appeal, that occurred just prior. I can't recall at the time exactly, just prior to the hearing on summary judgment after the matter was briefed, I believe. So that was during the course of litigation. But her own supervisor at the time was Julian McCormick, who was later found having sex with a juvenile inmate in the facility, as had been concerned and expressed about that. Let me follow up on Judge Tashima's question. My understanding from the record is that she claimed that there were three ways she was retaliated against. One was that there was a unique set of expectations directed solely to her. Secondly was she was denied her family leave. And thirdly, that a hostile work environment was created. The first two, I think, really don't go anywhere. But the last one is the one I asked opposing counsel about. Is that, the creation of a hostile work environment, is that enough of a retaliation under the Kohls-Salter case to let at least that portion of the claim survive? I believe so. I think the imposition of onerous, burdensome, and hostile scrutiny throughout the- What was the hostile, what created the hostile environment aside from the expectations list? What else? Continual monitoring at an unusual level that's not comparable to other supervisees. Ms. Ledford's subsequent supervisor, Mark Freckleton, testified that he had never seen a set of expectations like that for any other employee. I listened to that list of expectations, and it sounded like what any employer would want of any employee. And what I drew from the uniqueness of her being the only one who was told about them was she was the only one fool enough not to comply with them without having to be told. Most employees know if you're supposed to be there from 8 to 5, you're there from 8 to 5. Every now and then you get one that doesn't understand that. So you tell them in the clearest English possible, be there from 8 to 5. Well, then they're unique in having these work expectations told to them. But to call that a retaliation in a hostile work environment seems inappropriate. It seems to mean that an employer can't deal with a troublesome employee. Well, that's assuming that she was troublesome beyond any other employee, occasionally not making it to work on time or working overtime without clearance or something like that. And that's simply not the case. It's certainly not the record that that's the case, that she's anything in particularly troublesome other than being able to criticize. Who was it that she was told not to talk to? She was told there were restrictions based on speaking to other employees, including, I think, I don't remember if it was itemized or not, as to who she couldn't speak to. So she wasn't told you can't speak to state senators or you can't speak to the U.S. senator or you can't speak to the governor? No, she wasn't told that. What is clear, though, hold? Quit complaining in the workplace? Essentially. And don't be essentially pinning responsibility on all her interactions with her supervisor, again, who was later fired and eventually accepted a plea deal, I think. According to her subsequent supervisor, Mark Freckleton, whose testimony is eliminated on this. She was an ordinary employee. The First Amendment, you think, protects an employee's right to complain to workmates about how rotten the supervisors are, that sort of thing? I think it could if it deals with corruption. That's not all she spoke out about. She spoke out about time card fraud. She spoke out about systemic abuse of the performance-based standards numbers being manipulated to make the facility appear safer than it really was. She spoke out on all kinds of issues that have nothing to do with being a safety and security officer or very little to do. She spoke out against the failure of the department to comply with hiring, merit-based hiring practices, specifically with Ms. Roeder's other favoritism. When you say spoke out, you mean spoke in, talked in the workplace? Yes, to supervisors, to . . . And what was her job now? Safety and security officer. She was supposed to talk about things that affected safety and security. Some things, yes. But I don't know that that relates to merit failure to follow merit-based hiring practices. In summation, I would simply submit that I think the district court did everything it needed to do, that its findings were reasonably clear to support summary judgment, and that that judgment should be affirmed. Very well. Thank you. Any other questions from my colleagues? Thanks, counsel, to both of you for your argument. We appreciate it. The case just argued is submitted.
judges: Kleinfeld, Tashima, M. Smith